CHIEF JUSTICE RABNER delivered the opinion of the Court.
*916 **155 These consolidated appeals raise questions that relate to the Criminal Justice Reform Act (CJRA), N.J.S.A. 2A:162-15 to -26. After the law was enacted, the Court adopted various rules under its rulemaking authority.
We now revise one of those rules -- Rule 3:4A(b)(5) -- to make clear that a recommendation against a defendant's pretrial release that is based only on the type of offense charged cannot justify detention by itself unless the recommendation is based on one of two presumptions in the statute. See N.J.S.A. 2A:162-19(b). We also consider other aspects of the CJRA including what constitutes a "pending charge" at the time of a detention hearing.
**156 I.
In the first of the consolidated cases, defendant Hassan Travis challenges an order of pretrial detention. In the second, the State challenges an order releasing defendant Jonathan Mercedes. To recount *917 the factual allegations in both cases, we rely on the record established at the respective detention hearings.
A. State v. Travis
At about 1:00 a.m. on November 6, 2016, police officers responded to a report of a shooting in Newark. At the scene, multiple individuals relayed that "two young black males" had robbed them. One victim reported that he had been robbed of $25 and shot at three times. No one was injured.
After the victim told police that the suspects had touched his car, investigators processed the car and developed two sets of fingerprints. One set matched defendant Travis. Three months later, the victim identified Travis from a photo array as the person who robbed and shot at him.
Travis was charged in a complaint on February 16, 2017 with the following offenses: first-degree robbery, N.J.S.A. 2C:15-1(a)(1) ; second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) ; second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) ; second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) ; and conspiracy to commit robbery, N.J.S.A. 2C:5-2(a)(1). Several months later, on June 12, 2017, Travis turned himself in to the police.
Travis's Public Safety Assessment (PSA) rated him 1 out of 6 -- the lowest level -- for risk of failure to appear and assigned the same score for risk of new criminal activity. According to the PSA, Travis had no prior convictions, no pending charges at the time of the offense, and no record of failures to appear in court. Based on the robbery charge, the PSA recommended that Travis not be released.
The State moved for pretrial detention. At a hearing on June 15, 2017, Travis did not dispute probable cause. The hearing instead **157 focused on the issue of detention. The State stressed the violent nature of the offense, the fingerprints and identification, the threat Travis posed to the victim, and the recommendation in the PSA. Travis highlighted that he had turned himself in. He asserted that he had no knowledge of the incident until a family member told him about it, and he denied having anything to do with the crime. Travis also emphasized that he had no prior record, was employed, and had strong ties to the community.
The trial court found that Travis should be detained. The judge relied on multiple factors: (1) the nature and circumstances of the offense, that is, the "extraordinarily serious" charges that involved a shooting and a robbery; (2) the weight of the evidence, which included forensic evidence and an identification; (3) Travis's history and characteristics, namely, his lifelong residence in Essex County (for twenty-three years), five months at his current job, a lack of "family obligation[s] to keep him here," and a minimal criminal history; (4) the fact "that a prima facie case has been presented insofar as ... Pre-Trial Services recommend[ed] [against] release," see R. 3:4A(b)(5);[1] (5) Travis's "great motive to flee" based on the seriousness of the charges; and (6) the danger to the community "based on the sheer violence of the offense." See N.J.S.A. 2A:162-20.
Travis appealed, and the Appellate Division affirmed the order of detention. The *918 panel noted that the trial court followed the PSA's recommendation, which overcame the presumption in favor of release; considered relevant information and provided sufficient reasons; and did not abuse its discretion. We directly certified the matter under Rule 2:12-1. 230 N.J. 587, 170 A.3d 933 (2017). **158 B. State v. Mercedes
The case against defendant Mercedes involves two separate sets of allegations: a road-rage incident that resulted in a shooting (Complaint-Warrant 4353); and the possession of heroin (Complaint-Warrant 4838).
In the first matter, the police responded to a report of a shooting in Camden on July 2, 2017. According to the victim, as he attempted to merge onto Route 676, he got into an altercation with the driver of the car behind him. The second car followed him onto the highway, got off at the same exit, and drove to the area of Eighth and York Streets. After the victim parked and began to walk away, the other driver fired two shots, and one struck the victim in the left thigh. The second car then drove off.
Based on surveillance cameras in the area, the police were able to identify the suspect's car, a 2008 black Nissan, and use the registration to connect the car to a particular address in Camden. Ten days after the incident, the police located and stopped the car in that area. According to the affidavit of probable cause, the driver, Breana Hughes, said that her child's father used the car. She identified him as Jonathan Mercedes. The police later prepared a photo array that included Mercedes's picture, and the victim identified Mercedes as the person who shot him.
On July 12, 2017, Mercedes was charged in Complaint-Warrant 4353 with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) ; second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) ; second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1) ; and second-degree possession of a firearm after having been convicted of an offense, N.J.S.A. 2C:39-7(b)(1).
Three weeks later, an anonymous source who had provided reliable information in the past told law enforcement that he or she had seen Mercedes "drop off the resupply of narcotics to [a] drug distribution set" in Camden. The source added that he or she believed the car Mercedes used, a white Honda Accord, had a **159 hidden compartment in the front interior. The source had seen Mercedes operate the Honda on August 4, 2017, and observed a handgun and narcotics in the car.
Later that same day, law enforcement officials spotted Mercedes driving the Honda and arrested him on the outstanding warrant. A canine team conducted "an exterior sniff" of the car, and the dog alerted to the presence of narcotics. A search of the car, based on a search warrant, recovered 349 bags of heroin and $3458 in cash.
On August 8, 2017, Mercedes was charged in a separate, second Complaint-Warrant, No. 4838, with third-degree unlawful possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1) ; second-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(b)(2) ; and third-degree possession of a controlled dangerous substance within 1000 feet of school property, N.J.S.A. 2C:35-7(a).
Pretrial Services prepared two PSAs. For the first set of charges, No. 4353, the PSA rated Mercedes 4 out of 6 for risk of failure to appear and the same for risk of new criminal activity. There was also a flag for new violent criminal activity, which denoted an elevated risk of violence. According *919 to the PSA, Mercedes had one prior violent conviction for simple assault, two prior indictable convictions for drug distribution, and two prior disorderly persons convictions. He had failed to appear in court once in the past two years and eight times from 2010 to 2014. The PSA recommended that Mercedes not be released.
The second PSA, for No. 4838, rated Mercedes 5 out of 6 for risk of failure to appear and 6 for risk of new criminal activity. There was no flag for new violent criminal activity. The PSA repeated Mercedes's history and added that he had a "pending charge at the time of the offense" -- the four charges arising out of the shooting incident. This PSA also recommended against release.
**160 The State moved for pretrial detention, and the court heard argument on both matters at a hearing on August 18, 2017. The court found probable cause for both complaints; our focus now is on the State's application to detain Mercedes.
As to the first set of charges relating to the shooting, after the State presented various documents, counsel for Mercedes offered eight still photos from the surveillance videos and represented that the videos did not reveal the car's license plate number. Counsel also asserted that the victim could not describe the car's color and claimed no one was in the car despite a passenger depicted in the video. In addition, counsel argued that Ms. Hughes had told the police that her boyfriend had not driven the car in a while and that, aside from him, her brother, other family members, and friends drove the car as well. Counsel raised those arguments as to both probable cause and the weight of the evidence. Counsel also addressed Mercedes's criminal record and ties to the community.
The State contended that the still frames did not counter the evidence outlined in the affidavit: the police were able to observe the license plate and trace it back to Mercedes, whom the victim identified from a photo array. The State underscored the serious nature of the charges, Mercedes's nine failures to appear, and his criminal record.
The trial court did not detain Mercedes. It explained that the decision-making framework, and not the PSA scores, generated the recommendation against release, and declined to rely on Rule 3:4A(b)(5). "[T]he most significant factor ... is the weight of the evidence in this case," the court noted, "with some ... very significant issues with respect to the identification of this defendant." The court added that Mercedes's family and community ties, including the fact that he was the father of a young child, weighed in his favor as well.
As to Mercedes's prior record, the trial judge treated two separate cases for drug distribution sentenced on the same date as a single conviction. The court also noted that Mercedes's "failure-to-appear **161 history involves a recent failure to appear in a municipal case" and assumed the case was dismissed because it did not appear as a conviction.
The hearing then turned to the second set of charges -- the drug offenses. After the State's initial presentation, counsel for Mercedes stressed the case relied on constructive possession of drugs that were hidden from view in a car "used by a lot of people in the neighborhood." Mercedes did not own the car, counsel submitted, and no forensic evidence linked him to the drugs. Counsel also argued that the PSA numbers were "almost like double-dipping" because Mercedes had no idea that the shooting case was pending.
The State countered that some of those arguments would be "better served at a trial." It explained that people ordinarily *920 do not drive around with drugs in plain view and that forensic evidence is not generally available early after an arrest. The State also pointed to the recommendation against release, Mercedes's history of drug distribution, his "violent tendencies," his record of failing to appear, and the substantial potential sentence he faced.
The court denied the State's motion. It noted that the high PSA scores were "generated in significant measure" by the existence of a "pending charge" from the shooting offense. Yet, although the charges had been lodged against Mercedes, the court observed, "it's not as if he ... had been arrested and was out on release and then got rearrested on some separate charge." The court "look[ed] behind the numbers" and commented that "if that risk factor were removed," release would have been recommended. The trial judge thus concluded it was not appropriate to rely on the PSA's recommendation against release or Rule 3:4A(b)(5).
The court also found that there were "significant issues with respect to the weight of the evidence in this case." In particular, the court noted "there are certainly issues ... with the reliability of the confidential informant whose information led to the suspicion that there [were] narcotics and a firearm in the vehicle. To my understanding, there was no firearm recovered." The court **162 added that there were "serious questions about whether the defendant was aware of what was in there."
The court ordered Mercedes released on level 3 pretrial monitoring on both sets of charges and directed that he have no contact with the victim in the shooting case. Level 3 monitoring includes both in-person and phone contact with pretrial services on alternating weeks. Pretrial Release Recommendation Decision Making Framework (DMF) (Pretrial Release (DMF) ) 3 (Mar. 2018), https://www.judiciary.state.nj.us/courts/assets/criminal/decmakframwork.pdf.
The court stayed the order of release pending appeal. In a brief order, the Appellate Division affirmed. It explained that the trial "court's decision was not an abuse of its considerable discretion and comported with the applicable legal principles."
We granted leave to appeal and stayed Mercedes's release pending appeal. 230 N.J. 586, 170 A.3d 932 (2017). In both matters, we granted the Attorney General and the American Civil Liberties Union of New Jersey (ACLU) leave to appear as amicus curiae. We also granted amicus status to the County Prosecutors Association of New Jersey (CPANJ) in Travis's appeal.
II.
The Court reviewed the history of criminal justice reform in State v. Robinson, 229 N.J. 44, 52-56, 160 A.3d 1 (2017), and analyzed different parts of the CJRA in several recent cases, see State v. Dickerson, 232 N.J. 2, 177 A.3d 788 (2018) ; State v. S.N., 231 N.J. 497, 176 A.3d 813 (2018) ; State v. Ingram, 230 N.J. 190, 165 A.3d 797 (2017) ; Robinson, 229 N.J. 44, 160 A.3d 1. We begin with a brief overview of some relevant principles related to the new law and the court rules.
A.
The CJRA is to be "liberally construed" in favor of "primarily relying upon pretrial release by non-monetary means."
**163 N.J.S.A. 2A:162-15. A judge can detain a defendant pretrial, after a hearing, only "if the State proves by clear and convincing evidence that no release conditions would reasonably assure the defendant's appearance in court, the safety of the community, or the integrity of the criminal justice process."
*921 Ingram, 230 N.J. at 200-01, 165 A.3d 797 (citing N.J.S.A. 2A:162-18(a) ).
The State may seek to detain a defendant who is charged with one of the serious offenses set forth in section 19(a), or has been convicted of multiple serious crimes under section 19(a)(3). A rebuttable presumption of detention exists in only two circumstances: when the court finds probable cause to believe that a defendant has committed murder, N.J.S.A. 2C:11-3, or a crime that carries a sentence of life imprisonment, N.J.S.A. 2A:162-19(b)(1) to (2). In all other cases, a presumption of release applies. N.J.S.A. 2A:162-18(b).
At the detention hearing, unless a grand jury has already returned an indictment, the prosecutor must establish probable cause that the defendant committed the charged offenses. N.J.S.A. 2A:162-19(e)(2).
Next, to determine whether detention is warranted -- that is, whether any combination of conditions will reasonably protect against the risk of flight, danger, or obstruction, see N.J.S.A. 2A:162-19(c) -- "the court may take into account information" about the nature and circumstances of the offense, the weight of the evidence, the defendant's history and characteristics, the nature of the risk of danger and obstruction the defendant poses, and "[t]he release recommendation of the pretrial services program obtained using a risk assessment instrument." N.J.S.A. 2A:162-20(a) to (f).
The statute specifically provides for the creation of a statewide Pretrial Services Program to implement the Act. N.J.S.A. 2A:162-25(a). After an eligible defendant is arrested, a pretrial services officer prepares a PSA, which recommends whether the defendant should be released. There are two components to the recommendation: measuring and managing the risk a defendant presents.
**164 Criminal Justice Reform Report to the Governor and Legislature 4 (Dec. 2016), https://njcourts.gov/courts/assets/criminal/2016cjrannual.pdf?cacheID=a3GBpjl.
The risk assessment component relies on an approved instrument that is "objective, standardized, and [has been] developed based on [an] analysis of empirical data and risk factors." See N.J.S.A. 2A:162-25(c)(1). The New Jersey Judiciary worked with the Laura and John Arnold Foundation to develop a risk-assessment tool. Robinson, 229 N.J. at 62, 160 A.3d 1. The tool measures whether a defendant will fail to appear in court and whether he or she will engage in new criminal activity while on release. Ibid. As we explained in Robinson, the tool considers nine factors including the defendant's age, whether the offense is violent, and whether the defendant has any additional pending charges at the time of the offense, as well as prior convictions, failures to appear within the past two years, and prior jail sentences of at least fourteen days. Ibid.
The risk management component, referred to as the Decision Making Framework (DMF), "is primarily driven by the defendant's charges and the risk that the criminal justice system is willing to tolerate concerning defendants who are charged with certain types of crimes." Criminal Justice Reform Report to the Governor and the Legislature for Calendar Year 2017 (2017 Report ) 2, https://www.judiciary.state.nj.us/courts/assets/criminal/2017cjrannual.pdf. This Court approved the DMF after consultation with the Administrative Office of the Courts and Dr. Marie VanNostrand, Ph.D., a recognized expert in the area of pretrial release.
The DMF follows a multi-step matrix. The PSA is completed first, and it generates scores for failure to appear and new criminal activity; it also determines whether a flag for new violent criminal activity *922 applies. Pretrial Release (DMF) 1 (Step 1). The DMF then considers additional factors with a particular emphasis on the current charge. As part of that process, certain charges result in a recommendation against release regardless of the PSA **165 score: escape, aggravated manslaughter, manslaughter, aggravated sexual assault, sexual assault, first-degree robbery, carjacking, and seven weapons offenses. Ibid. (Step 5).
In addition, if a defendant is charged with an offense under the No Early Release Act, N.J.S.A. 2C:43-7.2, for a crime other than one referred to in Step 5, the DMF increases the recommendation for pretrial monitoring by one level. Id. at 2 (Step 8). A recommendation for level 2 monitoring, for example, which requires monthly in-person contact with a pretrial services officer, is elevated to level 3, which calls for weekly contact. Id. at 3 (Table 1). Defendants charged with certain other firearms offenses also receive a recommended increase in the level of monitoring. Id. at 2 (Step 9).
The DMF also generates a recommendation against release when a defendant who was previously arrested on two separate occasions is charged with a new offense while the other matters were still pending. Ibid. (Step 6).
Critical to this appeal, because defendant Travis was charged with first-degree robbery, the DMF resulted in a recommendation against his release.
Recommendations based on the PSA and the DMF, though, do not replace judicial discretion. Trial judges make the ultimate decision on release after they consider other relevant details. Robinson, 229 N.J. at 62, 160 A.3d 1 (citing N.J.S.A. 2A:162-20). When a court does not follow a recommendation, it must provide an explanation. N.J.S.A. 2A:162-23(a)(2).
B.
The Court asked the Committee on Criminal Practice to recommend court rules to implement the CJRA. To save judicial resources and avoid lengthy detention hearings, a majority of the Committee favored expanding the list of crimes in the CJRA for which there would be a presumption of detention. See Report of the Supreme Court Committee on Criminal Practice on Recommended Court Rules to Implement the Bail Reform Law, Part 2 **166 (Pretrial Detention and Speedy Trial) 2 (May 12, 2016), https://njcourts.gov/courts/assets/supreme/reports/2016/ bailreformlaw2016.pdf (suggesting amendment to N.J.S.A. 2A:162-19(b) ).
The Committee, however, did not propose a court rule to accomplish what the statute did not. Ibid. Instead, a majority recommended Rule 3:4A(b)(5), over the objection of the Public Defender, the ACLU, and others. See id. at 9-18, 170-71. The Court later adopted the rule under its rulemaking authority. See N.J. Const. art. VI, § 2, ¶ 3 ; Winberry v. Salisbury, 5 N.J. 240, 245, 74 A.2d 406 (1950).
The Rule's second paragraph, which is pivotal to this appeal, provides as follows:
The standard of proof for the rebuttal of the presumption of pretrial release shall be by clear and convincing evidence. The court may consider as prima facie evidence sufficient to overcome the presumption of release a recommendation by the Pretrial Services Program established pursuant to N.J.S.A. 2A:162-25 that the defendant's release is not recommended (i.e., a determination that "release not recommended or if released, maximum conditions"). Although such recommendation by the Pretrial Services Program may constitute sufficient evidence upon which the court may order pretrial detention, nothing herein *923 shall preclude the court from considering other relevant information presented by the prosecutor or the defendant in determining whether no amount of monetary bail, non-monetary bail conditions of pretrial release or combination of monetary bail and conditions would reasonably assure the defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the defendant will not obstruct the criminal justice process.
[R. 3:4A(b)(5) (emphases added).]
C.
State v. S.N. settled another important aspect of the law relating to pretrial detention. 231 N.J. at 500, 176 A.3d 813. It established the standard of review for a pretrial detention order: "whether the trial court abused its discretion by relying on an impermissible basis, by relying upon irrelevant or inappropriate factors, by failing to consider all relevant factors, or by making a clear error in judgment." Ibid.
**167 III.
A.
Defendant Travis argues that Rule 3:4A(b)(5) operates in a way that violates both the CJRA and his right to due process. He claims that the Rule strips him of the presumption of release guaranteed in the statute and creates a presumption of detention. According to Travis, the Rule allows for detention based solely on the crime charged -- in this case, first-degree robbery, which does not carry a presumption of detention under the CJRA.
Travis also contends that the State failed to carry its burden of proof at the detention hearing. He maintains that the evidence proffered was insufficient to prove that he presented a risk of flight, danger, or obstruction, and that the trial court could have released him on conditions.
The ACLU echoes Travis's argument about Rule 3:4A(b)(5) and contends that it impermissibly relieves the State of its burden to prove the need for detention. The ACLU also challenges the trial court's consideration of other factors.
The State maintains that the trial court did not abuse its discretion in detaining Travis and properly based its decision on a number of statutory factors. According to the State, the court did not rely solely on Rule 3:4A(b)(5). The State also submits that the Rule is valid and was properly adopted through the Court's rulemaking process. In addition, the State argues that the Rule does not create a presumption; it instead presents a procedural option. In the event the Court is inclined to change the Rule, the State argues that normal rulemaking channels should be followed; alternatively, any new rule should be applied prospectively.
The Attorney General and the CPANJ likewise support Rule 3:4A(b)(5). They contend that the prima facie standard in the Rule does not create a presumption of detention.
**168 B.
The State maintains that the trial court abused its discretion when it declined to detain defendant Mercedes. The State focuses on several issues: the court's failure to rely on Rule 3:4A(b)(5) under the circumstances of this case; the judge's "recalculati[on]" of the second PSA score because there was no evidence that Mercedes knew about the prior charge; the court's improper weighing of the relevant evidence; and its failure to consider appropriately Mercedes's extensive history of not appearing in court.
*924 Mercedes contends that the trial court did not abuse its discretion by ordering that he be released on conditions. Mercedes argues that the State did not satisfy its burden to overcome the presumption of release. As he did at the detention hearing, Mercedes contends that the weight of the evidence against him is weak. He maintains that the court properly found issues relating to identification in the first case, and constructive possession in the second. Mercedes also submits that the court properly considered and weighed other factors about his past record and "old" failures to appear in municipal court.
The Attorney General echoes a number of the State's arguments. The Attorney General contends that the trial court abused its discretion when it discounted the no-release recommendations and PSA scores because of their origin. The Attorney General also claims the court erred by finding that the weight of the evidence in each case cut against detention. Finally, the Attorney General argues that the court made an error in judgment in its overall balancing of the evidence when it "ignored" Mercedes's record of nine failures to appear and improperly considered his two prior drug convictions as one.
The ACLU contends that a trial court does not abuse its discretion when it reasonably concludes that the State's proofs are weak and gives that fact significant weight in denying the State's motion for detention. The ACLU also submits that it is not an abuse of discretion to give less or more weight to factors considered **169 in a PSA based on the circumstances surrounding those factors. Among other points, the ACLU highlights the court's assessment that the shooting case should not have been treated as a pending charge in the drug case in light of the facts here.
IV.
We note that, after oral argument, defendant Travis pled guilty to second-degree robbery. Because he was released subject to conditions pending sentencing, the arguments presented in his case are now moot. They are also "capable of repetition" in countless detention hearings yet may evade review if other defendants plead guilty before similar challenges can be resolved. See State v. Robertson, 228 N.J. 138, 147, 155 A.3d 571 (2017).
The validity of Rule 3:4A(b)(5) and its application at pretrial detention hearings raise issues of considerable public importance, particularly in the early days of the CJRA. See ibid. We therefore address the Rule at this time. We decline to evaluate whether the trial court abused its discretion when it ordered Travis detained, however.
V.
The CJRA went into effect on January 1, 2017. In the first twelve months, complaint-warrants were issued against 44,319 defendants. 2017 Report at 4. Prosecutors filed motions for pretrial detention in 19,366 cases. Ibid. 5350 motions were withdrawn or dismissed, and courts conducted hearings in the remaining 14,016 cases. Id. at 14. Judges granted 8043 motions (57.4 percent) and denied 5973 (42.6 percent). Ibid.
When we approved new court rules in August 2016, we hoped they would foster a fair and efficient process for criminal justice reform. Today, the experience from thousands of actual detention hearings helps inform our thinking. With that in mind, we return to the language of Rule 3:4A(b)(5) and conclude that parts of the Rule should be revised.
**170 As noted above, the CJRA calls for the release of defendants pretrial unless *925 the State can demonstrate by clear and convincing evidence that detention is warranted. See N.J.S.A. 2A:162-15 ; N.J.S.A. 2A:162-18(a). Once again, a presumption of detention, subject to rebuttal, applies in only two situations: when a court finds probable cause that a defendant has committed murder or an offense that carries a potential sentence of life imprisonment. N.J.S.A. 2A:162-19(b), (e)(2). Travis and the ACLU argue that parts of Rule 3:4A(b)(5) can be read in a way that is at odds with those principles.
Consider the third sentence of the Rule's second paragraph, which states, "such recommendation [against release] by the Pretrial Services Program may constitute sufficient evidence upon which the court may order pretrial detention...." The quoted language suggests a court can order detention based solely on a recommendation against release.
To be sure, the Rule is permissive, not mandatory. And the statute invites judges to consider an array of factors to decide a motion for pretrial release. They include the nature and circumstances of the offense, the weight of the evidence, the defendant's history and characteristics, the risk of danger and obstruction, and the release recommendation by the pretrial services program. N.J.S.A. 2A:162-20(a) to (f).
But a recommendation against release by itself cannot justify detention if it is based only on the type of offense charged -- unless that charge is encompassed by section 19(b). Otherwise, an offense that does not give rise to a presumption of detention under section 19(b), but is covered by the DMF, could result in detention based solely on the crime charged. That would run counter to the language of the statute. As a result, a charge of escape, manslaughter, sexual assault, first-degree robbery, carjacking, or the weapons offenses listed in the DMF -- any of which will generate a recommendation against release under the DMF -- cannot alone satisfy the State's burden to prove detention.
**171 The State does not disagree. It acknowledges that even when a PSA recommends against release, based on a charge other than murder or a crime that exposes a defendant to life in prison, the State must still present clear and convincing evidence to overcome the presumption of release and justify detention. To make the rule more clear, then, its text should point to the additional factors judges consider when they decide whether to detain a person. See N.J.S.A. 2A:162-20.
The second sentence of the rule's second paragraph raises a related concern. It reads, "The court may consider as prima facie evidence sufficient to overcome the presumption of release a recommendation by the Pretrial Services Program ... that the defendant's release is not recommended ...." R. 3:4A(b)(5). Once again, a recommendation against release, based on the type of charge alone, cannot justify detention unless it is based on a statutory presumption of detention. See N.J.S.A. 2A:162-19(b). The State still needs to establish the need for detention -- to protect against the risk of flight, danger, or obstruction -- by clear and convincing evidence.
The State represents that it routinely relies on evidence beyond a recommendation against release to meet its burden. We also recognize that individual detention hearings have not required an extended amount of court time. As both of these appeals demonstrate, the parties and the trial court have adjusted to the new law. Judges adeptly marshal the facts and arguments, and make sufficient findings in a reasonable period of time, without heavy reliance on the prima facie standard.
*926 The Rule's reference to "prima facie evidence sufficient to overcome the presumption of release" thus accomplishes little in practice and can be misinterpreted. With more than a thousand detention motions filed each month, we elect to clarify the Rule now rather than refer it back to the Committee. We do so to avoid confusion and any tension with the statute.
For all of those reasons, we revise the second paragraph of Rule 3:4A(b)(5) as follows:
**172 The standard of proof for the rebuttal of the presumption of pretrial release shall be by clear and convincing evidence. To determine whether a motion for pretrial detention should be granted, the court may take into account information about the factors listed in N.J.S.A. 2A:162-20.
As the statute makes clear, trial judges must consider a recommendation against release, see N.J.S.A. 2A:162-16(b), and may rely heavily on it as part of the court's overall analysis, see N.J.S.A. 2A:162-20(f). In fact, if a court declines to follow a recommendation, it is required to explain its reasoning. N.J.S.A. 2A:162-23(a)(2). Just the same, judges may rely heavily on the seriousness of a pending charge. See N.J.S.A. 2A:162-20(a). The more serious the crime, the greater the weight it may be given. And the conduct underlying the crime can of course be considered. In some cases, that evidence may be weighty; in others, the proofs may suggest the case is weak. All of those factors are appropriate to consider.
The State and the CPANJ note that certain higher PSA scores as well as other circumstances can generate a recommendation against release. See Pretrial Release (DMF) at 4. They suggest that the prima facie standard can survive in those cases. The Public Defender and the ACLU disagree.
We decline to adopt a hybrid rule. Without deciding the dispute, we note that clear rules that are easy to apply better serve our system of justice. An approach that would allow a prima facie standard in some situations but not others, with a recommendation against release in both, could well lead to confusion and mistakes. Moreover, trial judges will readily see and be able to assess high PSA scores, which are prominently displayed at the beginning of each PSA. And, as noted above, judges can certainly examine and rely on the underlying facts that generated a high PSA score. See N.J.S.A. 2A:162-20(a), (c). Having done so, courts may give more or less weight to those and other relevant factors.
VI.
We apply the revised version of Rule 3:4A(b)(5) to all pending and future motions for pretrial detention. See **173 State v. Earls, 214 N.J. 564, 569, 590-91, 70 A.3d 630 (2013) (discussing retroactivity factors). In addition, any defendant now held in pretrial detention may ask to reopen his or her detention hearing if (1) the order of detention relied solely on a recommendation against release by the pretrial services program, (2) that recommendation was based only on the type of offense charged, and (3) that recommendation was not based on an offense described in N.J.S.A. 2A:162-19(b). To be clear, if a court ordered detention based on a recommendation against release as well as some other reason, the order of detention will remain in effect, and no further proceeding will be held.
In defendant Travis's case, the trial court ordered detention for multiple reasons. It noted that "a prima facie case ha[d] been presented" based on the recommendation against release -- which was driven by the first-degree robbery charge and the DMF. But the court made a number *927 of other findings as well relating to the "extraordinarily serious" nature of the shooting and robbery, the eyewitness identification and forensic evidence, Travis's history and characteristics, and his motive to flee.
The case presented a close call, with a number of factors that favored release and others that pointed toward detention. Because Travis has entered a plea and is no longer detained, though, we do not assess the trial court's ruling.
VII.
In defendant Mercedes's case, the trial court did not rely on the recommendations against release in the PSAs or on Rule 3:4A(b)(5). Mercedes's appeal raises other issues that we address in turn.
A.
As noted earlier, Mercedes's detention hearing involved two sets of charges: the shooting case, in which the PSA rated him 4 out of 6 for risk of failure to appear and the same for risk of new **174 criminal activity; and the drug case, in which the PSA rated the risk levels at 5 and 6, respectively.
Mercedes appeared in court for the first time in this matter on both sets of charges. The parties dispute whether it was appropriate for the trial court to "look[ ] behind the numbers" when it evaluated the PSA on the second set of charges. The court explained that "[t]here's no information that [Mercedes] was aware ... that he had been charged with" the earlier shooting offense. "[I]f that risk factor were removed," the court observed, "it would be a release recommended case."
The trial judge corrected a mistake in the PSA when he in effect reevaluated whether the charges in the shooting case should be treated as "pending charges." As noted earlier, one of the nine risk factors that form the basis of the risk-assessment tool is whether a defendant had a "pending charge" at the time of offense. That term is defined as follows:
A pending charge is a charge that has a future pre-disposition related court date or is pending presentation to the grand jury, or has not been disposed of due to the defendant's failure to appear pending trial or sentencing, or that is in some form of deferred status (e.g., conditional discharge, conditional dismissal, pretrial intervention program). Charges include any Indictable or Disorderly Persons offense. A pre-disposition court appearance is any court appearance after arrest and prior to and including sentencing.
The pending charge must have been pending at the time of the alleged offense for the current arrest while the defendant was on some form of pretrial release pending case disposition. If the current arrest includes a bench warrant for failure to appear for a pre-disposition related court appearance, the underlying charge for the failure to appear is counted as a pending charge. If the defendant had an Indictable or Disorderly Persons charge pending at the time the current offense allegedly occurred, the answer to this risk factor is yes. Otherwise, the answer is no.
[Public Safety Assessment, New Jersey Risk Factor Definitions 2 (Mar. 2018), www.judiciary.state.nj.us/courts/assets/criminal/psariskfactor.pdf.[2] ]
*928 **175 Defendant Mercedes was arrested on August 4, 2017, for the charges related to (1) the shooting on July 2, 2017, and (2) the drug investigation on August 4, 2017. At that time, the charges for the shooting incident did not meet any of the conditions in the definition of "pending charge." Specifically, there was no "future pre-disposition related court date" for the offenses relating to the shooting. See ibid. Even without the definition in hand, the trial judge correctly questioned whether a charge for which Mercedes had not been previously arrested and placed on some form of release, and for which he had not failed to appear, should factor into the PSA's recommendation as a "pending charge."
The above definition of "pending charge" does not turn on whether a defendant was aware of an outstanding charge. That said, if in a case like this the record revealed that a defendant knew he was wanted on prior charges, for which no court dates had yet been set, the trial court could properly consider that fact as part of its overall evaluation of the risk the defendant posed.
In this matter, a possible source of the error in the PSA may have been an innocent mistake in the Complaint-Warrant for the drug offenses. That document mistakenly recorded the date of arrest as August 8, 2017 -- not August 4, 2017. Had Mercedes been arrested and released four days earlier on the shooting charges, they would have properly been considered "pending charges" at the time of a later drug arrest.
B.
The trial court also treated two separate prior convictions for drug offenses as a single conviction because Mercedes was sentenced in both cases on the same date. According to the PSA, the first conviction was for distribution of a controlled dangerous substance on or near school property on March 15, 2010, in violation of N.J.S.A. 2C:35-7. The second charge, for the same offense, occurred on April 10, 2010.
The issue is somewhat complicated. To calculate the PSA score, multiple violent convictions are considered, but only one non-violent **176 indictable conviction is counted. Laura and John Arnold Foundation, Public Safety Assessment: Risk Factors and Formula 3, http://www.arnoldfoundation.org/wp-content/uploads/PSA-Risk-Factors-and-Formula.pdf. Yet as a matter of fact, Mercedes has two prior drug convictions.
We cannot tell from the PSA whether the offenses were part of a single event -- which seems unlikely given the timing -- or a related course of conduct. Without knowing more, the convictions should not have been considered as one for purposes of the court's overall analysis. Indeed, the fact that a defendant has two seemingly unrelated prior convictions for drug distribution, which took place one month apart, may be relevant to a court's assessment of the risk he presents. That said, it was not improper for the trial court here to consider the age of the previous drug offenses.
C.
The PSA lists nine instances in which Mercedes failed to appear in court. One occurred within two years of the detention hearing. The others took place from 2010 to 2014. At the hearing, the court commented, "His failure-to-appear history involves a recent failure to appear in a municipal case, which I'm ... assuming ... was dismissed because it doesn't show up as a prior disorderly persons conviction."
*929 According to the State, the court's reasoning improperly suggests that failures to appear in municipal court are less serious than in Superior Court. We do not agree. Both are serious, and the court's comments did not suggest otherwise.
Of greater concern, it appears that the court gave little weight to Mercedes's extended history of not showing up for court. Although eight of his failures to appear were 3.5 to 7 years old at the time of the hearing, they reveal a troublesome pattern that raises serious questions about whether he will appear in court if released.
**177 D.
Finally, the trial court discounted the weight of the evidence in both sets of charges. For the shooting case, the court observed there were "very significant issues with respect to the identification of this defendant." The State made a straightforward presentation that linked the car captured on camera to the mother of Mercedes's child and ultimately to Mercedes himself; the victim then identified Mercedes from a photo array as the person who shot him. Defense counsel attempted to poke holes in that evidence and argued, from eight still photos, that the license plate could not be identified. Counsel also challenged the victim's statements and emphasized that others drove the car. To allow for a review of the trial court's thinking, the court should have placed its concerns about the identification briefly on the record.
As to the drug charges, the trial court found "significant issues with respect to the weight of the evidence" and noted concerns about constructive possession and the reliability of the informant.
At the detention hearing, the State presented an affidavit in support of a search warrant for the car, among other materials. The affidavit, signed by a detective with the Camden County Prosecutor's Office, revealed the following details about the anonymous source: (1) law enforcement officials had used the source in the past, and the person's information "resulted in the apprehension of wanted individuals"; (2) on August 4, 2017, the source "utilized" by the United States Marshals Service said he or she "had observed Mr. Mercedes arrive in the area of 5th and Grant Streets operating a white older model Honda Accord with tinted windows"; (3) the source also advised that he or she had observed Mercedes come to that area on several occasions "to drop off the resupply of narcotics to the drug distribution set located" there; (4) the source "believed that there is a hidden compartment located in the front inside area of the vehicle"; and (5) on August 4, 2017, the source "had observed a hand gun and narcotics inside the white Honda," while Mercedes operated the car. Following up on that information, the affidavit noted that law enforcement **178 located and followed the car, identified Mercedes as the driver, and arrested him after stopping the car. Pursuant to the search warrant, officers found 349 bags of heroin and $3458 in cash.
At the hearing, defense counsel stressed that Mercedes did not own the car and that "a lot of people in the neighborhood" used it. The court then made the following findings:
While the affidavit was found sufficient to justify the issuance of a search warrant for the vehicle, there are certainly issues with respect to ... the reliability of the confidential informant whose information led to the suspicion that there [were] narcotics and a firearm in the vehicle. To my understanding, there was no firearm recovered. There [were] narcotics recovered and cash recovered in a secreted location. There are, based on [the] proffer from the defense, serious *930 questions about whether the defendant was aware of what was in there. The confidential informant alleges that the defendant is involved in drug trafficking. But there are weight of the evidence issues in this case.
The court's analysis addressed two separate issues: whether the informant was reliable, which could affect the validity of the search warrant, and whether the defendant -- charged with drug possession and distribution -- knew about the contents of the hidden compartment.
The court on its own raised the question about the informant's reliability; that issue would not ordinarily surface until a motion to suppress. At that time, the reliability of an informant's tip would be analyzed under the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ; State v. Keyes, 184 N.J. 541, 555, 878 A.2d 772 (2005) ; State v. Smith, 155 N.J. 83, 92, 713 A.2d 1033 (1998) ; State v. Novembrino, 105 N.J. 95, 121-23, 519 A.2d 820 (1987).
Two factors would help inform that analysis: veracity and basis of knowledge. Smith, 155 N.J. at 93, 713 A.2d 1033 (citing Gates, 462 U.S. at 238, 103 S.Ct. 2317 ). We do not rule on the validity of the search warrant now. But we note that it supports the informant's veracity by pointing to past instances of reliability, and expressly details what the informant knew of the criminal activity from personal observation. The fact that no gun was recovered does not undermine the source's prior history or reliability.
**179 It was therefore not appropriate to discount the weight of the evidence based on the informant's reliability.
VIII.
Like the appeal in the Travis matter, the factors in Mercedes's case present a difficult question. We note that a number of those factors distinctly favor detention. We are also mindful of the deferential standard of review -- abuse of discretion -- which does not permit appellate courts to substitute their judgment for the trial court's. See S.N., 231 N.J. at 500, 176 A.3d 813.
Because we cannot tell how the above issues affected the trial court's findings and ruling, we remand the matter for the court to reevaluate the State's motion for detention with the above guidance in mind. Until then, we leave in place the order staying Mercedes's release.
IX.
For the reasons stated above, we revise Rule 3:4A(b)(5) effective today and dismiss Travis's appeal as moot. We remand Mercedes's appeal for further proceedings consistent with this opinion.
JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN filed a concurring opinion.

In its original form, Rule 3:4A(b)(5) provided in part as follows: "The court may consider as prima facie evidence sufficient to overcome the presumption of release a recommendation by the Pretrial Services Program ... that the defendant's release is not recommended .... [S]uch recommendation by the Pretrial Services Program may constitute sufficient evidence upon which the court may order pretrial detention...."

The Attorney General attached an earlier version of this document, effective March 1, 2017, to its brief. The definition for "pending charge" in both versions is substantively the same. It is not clear, though, that the parties or the judge had the definition before them at the time of Mercedes's detention hearing. To facilitate access to the document, the Administrative Office of the Courts has posted it on the Judiciary's website. See ibid.